**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| MARCO ANTONIO RODRIGUEZ, | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | CIVIL ACTION NO. H-23-cv-3944 |
| | § | |
| FREZ-N-STOR, INC., *et al.*, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND OPINION**

This case arises from a tragic accident. Marco Antonio Rodriguez worked for a company that assigned him the work of unloading pallets of frozen chicken parts from a rail car. During the unloading, the pallets tipped over and fell on him, severely injuring his spinal cord and causing paralysis. He and his wife (together, "Rodriguez") have sued Americold Logistics, LLC, the owner of the cold storage warehouse where the accident occurred, alleging that Americold was negligent in failing to ensure that the frozen chicken pallets had not shifted in transit before the unloading began. Rodriguez also sued Frez-N-Stor, the company responsible for moving the frozen chicken parts from Arkansas to Houston, alleging improper packaging that made the pallets unstable and allowed them to fall over during unloading.

Americold and Frez-N-Stor have each moved for summary judgment. (Docket Entry Nos. 76, 81). Based on the motions, the responses, the record, and the applicable law, the court grants Americold's motion for summary judgment, (Docket Entry No. 76), and denies Frez-N-Stor's motion for summary judgment, (Docket Entry No. 81). The reasons for these rulings are described below.

## I.    Background

On March 20, 2023, Marco Rodriguez was working for Luxor Staffing in Houston, Texas and assigned to work at the Americold warehouse.  He was directed to unload boxes of frozen chicken parts from a railcar at the cold storage warehouse.  (Docket Entry No. 4.5 ⁋⁋ 4.1-4.2).  The boxes were stacked on pallets in a refrigerated railcar and had been shipped from Arkansas to Houston.  (*Id.* ⁋ 4.2).  Each pallet weighed hundreds of pounds.  (*Id.*).

Rodriguez and the other workers had to unload each pallet individually.  (*Id.* ⁋ 4.4).  Rodriguez and his coworkers unloaded several pallets without incident.  (*Id.* ¶ 4.5).  Rodriguez then re-entered the railcar to unload more pallets.  (*Id.*).  At that point, pallets containing hundreds of pounds of frozen chicken tipped over and fell on Rodriguez, burying him under a pile of wood and frozen meat.  (*Id.*).  Rodriguez's spinal cord was severely damaged.  (*Id.*).  Rodriguez is a quadriplegic as a result of the accident.  (*Id.*).

Frez-N-Stor was responsible for moving the frozen chicken parts from Arkansas to Houston.  (*Id.* ⁋ 4.1).  Americold owned and operated the cold storage warehouse in La Porte, Texas, where the accident occurred.  (*Id.* ⁋ 4.2).  When he was injured, Rodriguez was employed by Luxor Staffing, which had assigned him to work at Americold's facility.  (*Id.* ⁋ 4.4).

In this lawsuit, Rodriguez alleges that Americold was negligent in failing to ensure that the pallets of frozen chicken had not shifted in transit before sending workers to unload them.  (*Id.* ⁋ 6.1).  Rodriguez alleges that Frez-N-Stor was negligent in: (1) failing to properly load and secure the pallets of frozen chicken; (2) failing to use proper air bags and dunnage—an old word meaning loose wood or other materials to keep cargo in position, usually in a ship—to secure the pallets of frozen chicken; (3) failing to realize that the pallets were not reasonably safe for transport via rail; (4) failing to properly package the pallets; (5) failing to properly package, secure, and brace the

pallets to prevent them from shifting and moving during transit; (6) failing to properly test the packaging, dunnage, and airbag equipment used to secure the pallets of frozen chicken before the rail transit; (7) failing to ensure that the railcar was appropriate to transport multiple pallets of frozen chicken; and (8) failing to comply with industry standards and regulations on the proper procedures for properly and safely loading, securing, and transporting pallets of frozen chicken. (*Id.* ¶ 5.1). Both Americold and Frez-N-Stor have moved for summary judgment.

## II.     The Legal Standard

"Summary judgment is appropriate where 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Springboards to Educ., Inc. v. Pharr-San Juan-Alamo Indep. Sch. Dist.*, 33 F.4th 747, 749 (5th Cir. 2022) (quoting FED. R. CIV. P. 56(a)). "A fact is material if it 'might affect the outcome of the suit.'" *Thomas v. Tregre*, 913 F.3d 458, 462 (5th Cir. 2019), *as revised* (Jan. 25, 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson*, 477 U.S. at 248). When considering a motion for summary judgment, the court "must consider all facts and evidence in the light most favorable to the nonmoving party" and "must draw all reasonable inferences in favor of the nonmoving party." *Ion v. Chevron USA, Inc.*, 731 F.3d 379, 389 (5th Cir. 2013).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion" and pointing to record evidence demonstrating that there is no genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also* FED. R. CIV. P. 56(c). "When 'the non-movant bears the burden of proof at trial,' a party moving for summary judgment 'may merely point to the absence of evidence and thereby shift to the non-movant the

burden of demonstrating by competent summary judgment proof that there is a dispute of material fact warranting trial.'" *MDK Sociedad De Responsabilidad Limitada v. Proplant Inc.*, 25 F.4th 360, 368 (5th Cir. 2022) (alteration adopted) (quoting *Nola Spice Designs, L.L.C. v. Haydel Enterprises, Inc.*, 783 F.3d 527, 536 (5th Cir. 2015)).

"Once the moving party has initially shown that there is an absence of evidence to support the non-moving party's cause, the non-movant must come forward with specific facts showing a genuine factual issue for trial." *Houston v. Tex. Dep't of Agric.*, 17 F.4th 576, 581 (5th Cir. 2021) (quotation marks and quoting reference omitted). "[A] party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Jones v. Gulf Coast Rest. Grp., Inc.*, 8 F.4th 363, 368 (5th Cir. 2021) (quotation marks and quoting reference omitted). Rather, the nonmovant "must identify specific evidence in the record and articulate the precise manner in which that evidence supports [its] claim." *Shah v. VHS San Antonio Partners, L.L.C.*, 985 F.3d 450, 453 (5th Cir. 2021) (alteration adopted) (quotation marks and quoting reference omitted).

The movant is entitled to judgment as a matter of law when "the nonmoving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Celotex Corp.*, 477 U.S. at 323. But "[i]f 'reasonable minds could differ' on 'the import of the evidence,' a court must deny the motion." *Sanchez v. Young Cnty.*, 956 F.3d 785, 791 (5th Cir. 2020) (quoting *Anderson*, 477 U.S. at 250–51).

## III. Analysis

### A. Americold's Motion for Summary Judgment

Americold previously moved for summary judgment, arguing that it was statutorily immune under the Texas Workers' Compensation Act from Rodriguez's negligence claim. It

4

contended that Luxor Staffing had included Americold as an "additional insured" on Luxor's worker's compensation insurance policy, which included an exclusive remedy provision. (Docket Entry No. 63). Section 408.001(a) of the Texas Labor Code provides that "[r]ecovery of workers' compensation benefits is the exclusive remedy of an employee covered by workers' compensation insurance coverage . . . for . . . a work-related injury sustained by the employee." Americold is entitled to summary judgment under Section 408.001(a) if shows that, as a matter of law, it was: (1) Rodriguez's employer within the meaning of the Texas Worker's Compensation Act, and (2) covered by a worker's compensation insurance policy. *Western Steel Co. v. Altenburg*, 206 S.W.3d 121, 123 (2006).

The court denied Americold's first motion for summary judgment, finding that it had not presented evidence showing that Americold had worker's compensation insurance. (Docket Entry No. 73). The central issue was whether Luxor had added Americold as an additional insured on the Luxor worker's compensation policy. Americold had presented an affidavit from Joyce Dominguez, Vice President of Implementation & Compliance for Luxor, and the Staffing Services Agreement between Luxor and Americold. Neither document clearly showed that Americold was an additional insured on the Luxor worker's compensation policy. The Staffing Services Agreement stated that Luxor and Americold agreed that Luxor would add Americold to its policy, but did not show that Luxor had done so. The Dominguez affidavit stated only that Americold paid Luxor a markup for the cost of that insurance, not that Luxor had made Americold an additional insured. (Docket Entry No. 76-4 at 2).

Americold now moves for summary judgment a second time, presenting two additional documents as evidence: (1) an "alternate employer endorsement" and (2) a certificate of liability insurance. (Docket Entry No. 76). Americold argues that this evidence, together with the Staffing

Services Agreement and a second affidavit from Joyce Dominguez, clearly shows that Americold was added to the Luxor workers' compensation policy and can invoke the exclusive remedy defense. (*Id.*).

The Staffing Services Agreement included a requirement that Luxor maintain worker's compensation insurance with at least one million dollars in coverage. The Agreement required Luxor to endorse its worker's compensation policy to name Americold as an additional insured. Americold argues that the alternate employer endorsement, which included a certificate naming Americold as the certificate holder, shows that Americold was an additional insured. (Docket Entry No. 76-3).

Americold cites *Robles v. Mount Franklin Food, L.L.C.*, 591 S.W.3d 158, 167 (Tex. App.—El Paso 2019, pet. denied) and *Martinez v. Valassis Sales & Mktg. Servs., Inc.*, 2020 WL 7010045, at *3 (S.D. Tex. Oct. 8, 2020), to argue that an alternative employer endorsement to a staffing company's worker's compensation policy is sufficient to show that a temporary employer, like Americold, is an additional insured under that policy. (Docket Entry No. 76 at 9-10).

Rodriguez opposes Americold's second motion for summary judgment on several grounds. First, he argues that Americold's motion is an untimely Rule 59(e) motion, which requires Americold to show that the evidence it now presents—the alternative employer endorsement and the revised affidavit from Joyce Dominguez—could not have been discovered earlier by proper diligence. Rodriguez argues that Americold has not made this showing. (Docket Entry No. 78 at 4). Second, Rodriguez argues that Americold did not present him with the additional evidence Americold has submitted to support its second summary judgment motion, despite multiple requests for relevant insurance policies. Rodriguez contends that Americold's "failure to provide the entire insurance contract which would purport to cover Americold via the Texas Worker's

Compensation program would be enormously detrimental to [Rodriguez's] ability to recover the full amount of damages [he] believe[s] [he is] entitled to, and is thus not a harmless error." (*Id*. at 10). And because "[n]early the entirety of Americold's second Joyce Dominguez [affidavit] refers to such evidence … its use should be precluded as well." (*Id*.).

Third, Rodriguez argues that even if Americold's additional summary judgment evidence is considered, it is insufficient to establish that Americold was covered under Luxor's worker's compensation policy. (*Id*. at 11). Rodriguez points to the alternate employer endorsement statement that "we will reimburse the alternate employer for the benefits required by the worker's compensation law if we are not permitted to pay the benefits directly to the persons entitled to them." (Docket Entry No. 76-2). Rodriguez notes that the Certificate of Liability Insurance names Luxor Staffing Inc. as the insured and states that the Certificate "confers no rights upon the certificate holder." (Docket Entry No. 78 at 12; Docket Entry No. 76-3). Rodriguez also points to the fact that the Worker's Compensation Field on the Certificate of Liability Insurance was marked and states that the alternate employer endorsement for worker's compensation coverage "applies where required by contract." (*Id*.). Finally, Rodriguez notes that two difference insurers issued the alternate employer endorsement and the certificate of liability insurance. Rodriguez argues that without proof of the terms of the actual insurance policy issued to Luxor, the evidence shows only that "Luxor had alternate employer designations for some potential entities, without ever saying Americold was one of those entities." (*Id.* at 13).

The court previously granted Americold leave to file a second summary judgment motion after it had tried to obtain the relevant insurance agreements from Luxor but was unable to do so before filing its first motion. (Docket Entry No. 91). The court declines to strike the additional evidence presented in the second motion for summary judgment or to deny the motion on the basis

that it is untimely under Rule 59(e).  The question is whether Americold has shown that, based on the undisputed facts, it was covered as an additional insured under Luxor's policy as a matter of law.

The court starts with the cases that Americold cites.  In *Martinez*, 2020 WL 7010045, at *3, a temporary employer whose workers were hired through a staffing services agreement was covered by a worker's compensation policy.  The temporary employer presented the following evidence of coverage: (1) the staffing company's insurance policy contained an alternate employer endorsement applying the policy to "those alternate employers as specifically required by contract"; (2) the staffing services agreement required the staffing company to "provide alternate employer status to [the temporary employer] under its worker's compensation policy"; and (3) a knowledgeable employee of the temporary employer testified that the temporary employer paid the staffing company a markup for, among other things, the premium for the alternate employer endorsement.  *Id.*  The temporary employer in *Martinez* provided the same type of summary judgment evidence presented in this case.

Rodriguez does not attempt to distinguish *Martinez*.  Instead, he argues that this court incorrectly relied on another case, *Tractor Supply Co. of Texas, L.P. v. McGowan*, 2016 WL 1722873 (Tex. App.—Waco Apr. 28, 2016, pet. denied), in granting summary judgment to the temporary employer in *Martinez*.  In *Tractor Supply*, a Texas intermediate appellate court found that a staffing agency's worker's compensation policy covered the plaintiff's temporary employer because the policy included an alternate employer endorsement.  *Id.* at *3.  Although the policy did not name the temporary employer as an alternate employer, the policy referred to the alternate employer insurance as "blanket" and the insurer was provided with a list of the insured's client companies, which included the temporary employer.  *Id.*  The court found that the temporary

employer had shown that it was covered by the worker's compensation policy for the plaintiff's injury. *Id*.

Rodriguez argues that *Tractor Supply* is distinguishable because: (1) the court in *Tractor Supply* could examine the insurance policy, while in this case, the policy itself is not part of the summary judgment record; and (2) the staffing company in *Tractor Supply* gave the worker's compensation insurance company a list of client companies, while in this case, the documents Americold and Luxor submitted do not list Americold as an alternate employer. (Docket Entry No. 78 at 13). In the other case Americold cites, *Robles*, 591 S.W.3d at 167, the court held that a temporary employer could invoke the exclusive remedy provision to defend against claims by one of its temporary employees on the basis that the temporary employer was an insured under the "alternate employer endorsement" in the staffing company's worker's compensation policy. *Id.* at 167 n.5. Rodriguez does not meaningfully address this case.

The summary judgment evidence that Americold has presented shows, as a matter of law, that Americold was covered under Luxor's worker's compensation insurance policy through the alternate endorsement. The staffing services agreement states that "[t]he Workers' Compensation policy must . . . include 'Alternate Employer' converge [sic]." (Docket Entry No. 76-1 at 7). The alternate employer endorsement states that it applies to "any alternate employer of [Luxor's] employees." (Docket Entry No. 76-2 at 2). When Rodriguez was injured, he was a Luxor employee and Americold was the alternate employer.

The certificate of liability insurance states "that the policies of insurance listed below have been issued to the insured named above for the policy period indicated." (Docket Entry No. 76-3 at 2). The worker's compensation and employers' liability policy are listed. (*Id*.). The policy coverage is up to $1,000,000 for "each accident." (*Id*.). Americold presents an affidavit from

Joyce Dominguez, Vice President of Implementation & Compliance for Luxor, stating that "Luxor complied with the Agreement by extending Worker's Compensation coverage to Americold through an Alternate Employer Endorsement (Exhibit 'B'). The Alternative Employer Endorsement applies to the Luxor policy with an effective date of June 30, 2022, to June 30, 2023. The endorsement covers any 'alternate employer' of Luxor's employees." (Docket Entry No. 76-4 at 2).

The record shows that when Rodriguez was injured at the Americold facility in 2023, Americold was covered by Luxor's worker's compensation insurance policy under the alternate employer endorsement. The negligence claim against Americold is therefore dismissed, with prejudice because amendment would be futile.

### B.  Frez-N-Stor's Motion for Summary Judgment

Frez-N-Stor argues that Rodriguez's negligence claims against it fail because he has presented insufficient evidence on the essential elements of his claims. (Docket Entry No. 81). The elements of a common-law negligence claim are: (1) a legal duty; (2) a breach of that duty; and (3) damages proximately resulting from the breach. *Elephant Ins. Co., LLC v. Kenyon*, 644 S.W.3d 137, 144 (Tex. 2022).

The evidence shows that in early March 2023, Frez-N-Stor packed 72 pallets of boxed frozen chicken products for rail shipment by the Union Pacific Railroad from Arkansas to the Americold facility in Houston. (Docket Entry No. 81 at 7). On March 17, 2023, Frez-N-Stor's employees pulled the frozen chicken boxes from freezers, placed the boxes on wooden pallets, applied stretch wrap to secure the boxes to the pallets, and then used a forklift to load the pallets into the railcar. (*Id*.). Frez-N-Stor employees used airbags and slip sheets to protect the pallets from movement or damage during transit. (*Id*.). Frez-N-Stor employees then photographed the

loaded railcar, closed and sealed the doors, and let Union Pacific know that the railcar was ready for transport to Texas. (*Id*.).

Frez-N-Stor concedes that when the railcar arrived at Americold's facility in Houston, the contents had shifted. (*Id.* at 8). Frez-N-Stor argues that when the railcar doors were opened in Houston, none of the pallets or contents fell out of the car and there was no evident damage to the pallets. (*Id*.). Marco Rodriguez, another Luxor employee, J. Todd Neyhart, and other Americold workers were assigned to unload the railcar. (*Id.* at 9). This was Rodriguez's first time unloading a railcar in the five weeks since Luxor had assigned him to work at Americold. (*Id*.). Frez-N-Stor argues that before the accident, Rodriguez had neither experience nor training on safely unloading railcars. (*Id*.).

The evidence shows that Neyhart and Rodriguez began to unload the railcar using a forklift. (*Id*.). After they unloaded the first few pallets of chicken, they went inside the railcar to unload the remaining pallets by hand because the boxes were leaning off of the pallets. (*Id*. at 10). As they did so, several pallets tipped over and fell on Rodriguez. (*Id*.)

Rodriguez disputes that Frez-N-Stor correctly loaded the pallets in the railcar before it left Arkansas for Texas. (Docket Entry No. 96). Rodriguez argues that "[w]hen cargo is loaded properly, workers can remove it from a railcar with a forklift . . . . But because the chicken cases were leaning off the pallet, the workers had no choice but to remove the product by hand." (*Id.* at 9). Rodriguez argues that the evidence shows that Frez-N-Stor did not load the pallets in compliance with the Association of American Railroads standards, causing them to fall when unloading began. (*Id*. at 10).

#### a.  Duty

"The threshold inquiry in a negligence case is duty," which "encompasses several questions of law: the existence, scope, and elements of a duty." *Elephant Ins. Co.*, 644 S.W.3d at 144. "In determining whether the defendant was under a duty, the court will consider several interrelated factors, including the risk, foreseeability, and likelihood of injury weighed against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant." *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990) (citation omitted) (citing *Otis Eng'g Corp. v. Clark*, 668 S.W.2d 307, 309 (Tex. 1983)).

Frez-N-Stor argues that it owed no duty to Rodriguez and the other workers unloading the railcar to: (1) warn those workers that the pallets of frozen chicken products might shift and pose a risk to the workers during unloading; or (2) to ensure that proper safety measures had been taken to prepare the pallets for safe unloading. (Docket Entry No. 81 at 14). Frez-N-Stor argues that the only issues are whether Frez-N-Stor breached its duties to Americold employees to load the pallets on the railcar in a way that: (1) would not create any hidden or latent risks to the workers unloading them; and (2) would allow the workers to safely unload them. (*Id.* at 15).

Frez-N-Stor argues that "[t]he first duty imposed by law upon shippers of goods is that upon arrival of the goods, there are no hidden or latent defects in the loading." (*Id.*). Frez-N-Stor cites *Wright v. B.F. Huntley Furniture Co.*, 299 F.2d 904 (4th Cir. 1962), to support its argument that because Rodriguez and Neyhart admit that they saw that the pallets had shifted but kept unloading them, the manner in which they were loaded was not a hidden or latent defect. (Docket

Entry No. 81 at 16). Frez-N-Stor cites Texas cases and the Second Restatement of Torts[1] in arguing that the duty it owed Rodriguez was to make any unreasonably dangerous conditions safe or to warn him of that danger. (Docket Entry No. 81 at 17). Frez-N-Stor argues that when Rodriguez saw that the load had shifted, he could and should have taken steps to avoid harm, including refusing to continue unloading or to re-enter the railcar. (*Id.* at 17-18). Frez-N-Stor contends that because any loading defects were apparent before or very soon after unloading began, Frez-N-Stor did not breach its duty of ensuring that the way the railcar was loaded presented no hidden or latent defect. (*Id.* at 19).

Frez-N-Stor also argues that it did not breach its duty to load the railcar so that the workers unloading it would be able to do so safely if they exercised proper care. (*Id.*). Frez-N-Stor cites deposition testimony from Jerry Harrelson, Americold's operation manager, stating that the workers who unloaded the frozen pallets of chicken parts could have safely done so by using a "controlled fall" or a forklift cage or basket.[2] (Docket Entry No. 81 at 20; Docket Entry No. 81-3 at 200:4-17).

Rodriguez responds by pointing to evidence that he contends shows that Frez-N-Stor failed to properly prepare the load for rail transit by: (1) failing to properly wrap the entire cargo in stretch wrap because the stretch wrap did not encompass the wooden pallets on which the boxes of frozen chicken were stacked; and (2) failing to use enough airbags, dunnage, and filler to create a tight, compact load, which allowed the cargo to lean and become unstable. (Docket Entry No. 96 at 11-

---

[1] *See* RESTATEMENT (SECOND) OF TORTS § 343, cmt. B (1965) ("[An invitee] is entitled to expect such care not only in the original construction of the premises, and any activities of the possessor or his employees which may affect their condition, but also in inspection to discover their actual condition and any latent defects, followed by such repair, safeguards, or warning as may be reasonably necessary for his protection under the circumstances.").

[2] Harrelson described a "controlled fall" method of unloading the boxes as one where "[y]ou cut the plastic, and then you allow the product to freefall onto the floor." (Docket Entry No. 81-3 at 185:2-4). He also described the forklift cage and basket method as putting cages or baskets on forklifts "for it to . . . raise associates up to hand-stack stuff down into the cage." (*Id.* at 200:4-17).

13).   Rodriguez argues that these failures caused the load to shift significantly during transit, allowing the boxes of frozen chicken parts to lean off the edges of the pallets and tip over when unloading began.  (*Id.* at 13-14).   Rodriguez cites to photos of the load, deposition testimony from Frez-N-Stor's corporate representative and from a supervisor, and the American Association of Railroads standards on properly securing cargo for rail transport.  (*Id.*).   Rodriguez also points to evidence showing that neither of the Frez-N-Stor employees responsible for training the workers loading the railcars or those workers were offered formal training in how to load and secure cargo properly and were not familiar with the American Association of Railroads standards for doing so. (*Id.* at 14).   Rodriguez argues that Frez-N-Stor breached its duty to Rodriguez (as a worker tasked to unload the pallets) by failing to take reasonable care in loading the pallets into the railcar so that they could be safely unloaded after the rail transit.  (*Id.* at 20).

Rodriguez argues that testimony from Michael Dickmeyer, General Director of Freight for Union Pacific and a member of the American Association of Railroads, shows that the standards promulgated by the Association provide the applicable standard of care for loading and securing cargo for rail transport.  (*Id.* at 25 (citing Docket Entry No. 96-21)).   As noted above, Rodriguez argues that Frez-N-Stor failed to follow the Association standards by failing to properly use stretch wrap to fully wrap the pallets, and by failing to use airbags, dunnage, and other filler material to ensure that the load was secure and to eliminate void spaces where shifting could occur.  (*Id.* at 21-22).   Rodriguez also argues that there are factual disputes material to determining whether Frez-N-Stor employees were trained on the American Association of Railroads standards—or trained at all—before loading railcars with cargo that could shift in transit in ways that made it hazardous to unload.  (*Id.* at 22).

Rodriguez cites *United Rentals North America, Inc. v. Evans*, 668 S.W.3d 627, 639 (Tex. 2023), to argue that a company loading cargo has a duty to third parties to do so safely.  (Docket Entry No. 96 at 15).  Rodriguez argues that the Fourth Circuit caselaw Frez-N-Stor cites, including *Wright v. B.F. Huntley Furniture Company*, holding that the duty of a shipper is to warn of latent or concealed defects only, is inapplicable because Texas courts have refused to apply the rule in those cases to bar an injured third party from bringing a claim against a negligent shipper or carrier.  (Docket Entry No. 96 at 16).  In *United Rentals,* the Texas Supreme Court affirmed the holding that a shipper may have a duty to third persons to ensure that cargo is loaded safely.  (Docket Entry No. 96 at 15).  Rodriguez argues that even if the *Wright v. B.F. Huntley Furniture Company* rule did apply, Frez-N-Stor, as the shipper, owed a duty to Rodriguez to safely pack the pallets.  Citing *White v. Dietrich Metal Framing*, 2007 WL 7049797, at *6 (E.D. Tex. July 5, 2007), Rodriguez argues that "if a shipper assumes the responsibility for loading its property onto a motor vehicle, it has the duty to exercise reasonable care in properly securing the load."  (Docket Entry No. 96 at 16).

Rodriguez argues that there are factual disputes material to determining whether the defective loading was obvious to an ordinary observer entering the railcar.  Rodriguez testified that he did not recall noticing that the pallets were leaning when he entered the railcar.  (*Id*. at 18; Docket Entry No. 96-7 at 101:7-11).  He also testified that if he had seen that the pallets had shifted, he would not have unloaded them.  (Docket Entry No. 96 at 18; Docket Entry No. 96-7 at 104:18-20).  There are factual disputes material to determining whether the defects in how the pallets were loaded were patent or not.  These factual disputes are among those precluding summary judgment on whether Frez-N-Stor breached a duty to Rodriguez in the way its workers loaded the pallets, even under the Fourth Circuit rule that Frez-N-Stor cites.

The case law discussing the duty a shipper of goods owes to a third-party responsible for unloading those goods at the destination is sparse, at best. Rodriguez cites *United Rentals*, 668 S.W.3d, as involving analogous facts. In that case, a motorist was killed when a large piece of equipment carried on a United Rentals flatbed trailer struck an overpass and the falling equipment parts crushed the motorist's vehicle. The Texas Supreme Court noted that because the shipper, United Rentals, often moved its heavy equipment on highways, it knew the dangers and had ample opportunity to ensure that its equipment was safely loaded for shipment. *Id.* at 639. The court held that United Rentals owed a duty to motorists to refrain from "negligently creating a dangerous situation on the highway." *Id.* (internal quotations omitted).

Rodriguez argues that *United Rentals* stands for the proposition that "anyone who participates in the loading of cargo has a duty to 'refrain from negligently creating a dangerous situation'" for third parties. (Docket Entry No. 96 at 6; *United Rentals*, 668 S.W.3d at 639). Rodriguez argues that after *United Rentals*, shippers owe this duty to third parties, such as workers tasked with loading shipments. The *United Rentals* court repeatedly emphasized that the shipper's duty in that case was heightened because it was obviously transporting oversized cargo on public roadways traveled by motorists who would have no way of knowing whether the cargo was safely loaded. In this case, by contrast, the parties dispute whether there were visible or hidden defects in the way the pallets of frozen chicken parts were packed before transit that made it dangerous to unload them when they arrived at the destination.

Rodriguez cites *White v. Dietrich Metal Framing,* 2007 WL 7049797. In that case, White, an employee of a trucking company, sued a manufacturing company, Dietrich Metal, after White was seriously injured while driving a tractor-trailer loaded with Dietrich steel products. *Id.* at *3. White was present when Dietrich employees loaded the steel products into the trailer, and he

16

complained about overloading. *Id*. Despite his concern, White proceeded to drive as instructed. *Id*. The truck and trailer tipped over during the trip. *Id*. Dietrich moved for summary judgment, arguing that it owed no duty to White that it breached because the allegedly improper loading was obvious and apparent to White, rather than "latent" or "concealed." *Id*. White argued that summary judgment was inappropriate because there was a genuine factual dispute material to determining whether the loading defect was obvious or not. *Id*.

Much of the district court's reasoning in *Dietrich* was specific to the duties between shippers and carriers, which are not at issue here. However, the court considered the Fourth Circuit rule that Frez-N-Stor cites, concluding that "[a]lthough a carrier is primarily responsible for the security and safety of the cargo, a shipper such as Dietrich may, nevertheless, be held liable for negligent loading if the defect is latent or concealed, 'so that a reasonable inspection of the load by the carrier will not uncover the shipper's negligence.'" *Id.* at *8 (citing *Decker v. New England Pub. Warehouse, Inc*., 749 A.2d 762, 787 (Me. 2000)). Under this rule, Frez-N-Stor would not be liable for negligently loading the railcar if "the load's condition or securement, or lack thereof, was patent and obvious," but may be liable if the load's dangerous condition or "securement" was not readily observable. *See Dixon v. Leopoldo Garza Logistics, Inc*., 2020 WL 4689217, at *4 (S.D. Tex. June 26, 2020).

The record reflects a genuine factual dispute material to determining whether the danger the pallets presented on unloading was latent and hidden, or whether it was patent and obvious. Frez-N-Stor presents three photos, one showing the pallets packed with boxes of chicken parts after they were loaded into the railcar in Arkansas, one showing the pallets after they had arrived at the Americold facility in Houston, and one showing the pallets after Rodriguez and Neyhart had partially unloaded them. (Docket Entry No. 81 at 9-11). The photos do not clearly show that the

17

pallets were stacked or loaded in a way that presented a serious and obvious risk of harm to someone unloading them.  Rodriguez testified in his deposition that while he does not recall whether the boxes of chicken pallets were leaning when he began to unload them, "[i]f the boxes were leaning and I think it was unsafe, I wouldn't have gone in there."  (*See* Docket Entry No. 96-7 at 101:7-11, 102:11-15; Docket Entry No. 96-7 at 101:7-11, 102:11-15; 105:12-15).

On the other hand, Neyhart, who was with Rodriguez when they began to unload the railcar, testified that he took photos when he entered the railcar "for [his] own safety purposes" and to "show the upper people later on that that's not safe."  (Docket Entry No. 81-4 at 39:12-14). Neyhart also testified that Rodriguez asked Neyhart how he would know if any of the pallets were starting to tip over before they started to unload the pallets.  (*Id.* at 163:3-6).

In *White*, the plaintiff recalled questioning the safety of the load and characterizing it as "loaded too high" and "overloaded."  *White*, 2007 WL 7049797 at *24.  There is no record evidence of Rodriguez clearly stating that he knew that the cargo was stacked in a dangerous way before it fell on him.

Frez-N-Stor argues that because Rodriguez had not unloaded a railcar before, he could not tell whether the pallets presented a risk to the workers unloading them.  Courts consider relevant experience in determining whether an observer such as Rodriguez can recognize whether a defect is latent or patent.  *See Dixon*, 2020 WL 4689217 at *4; *White* 2007 WL 7049797 at *7.  In the context of claims by carriers against shippers, the Eighth Circuit has described relevant experience as the "primary factor" in determining whether the carrier should be held to know that a defect was latent or patent.  *See Vargo-Schaper v. Weyerhaeuser Co.,* 619 F.3d 845, 849 (8th Cir. 2010).  To the extent that factor is relevant, it tends to show that Rodriguez, lacking prior experience in

18

unloading similar pallets, would not see any unreasonably dangerous condition in the way the pallets were stacked before they fell.

On this record, there are factual disputes material to determining whether the risk of the pallets tipping over and falling during unloading was one that Rodriguez saw or should have seen and taken steps to avoid. These disputes are among those precluding summary judgment in favor of Frez-N-Stor.

### b. Causation

Frez-N-Stor also argues that Rodriguez has not shown that it was negligent in ways that proximately caused Rodriguez's injury. (Docket Entry No. 81 at 21). Under Texas law, "[n]egligence requires a showing of proximate cause . . . . " *Union Pump Co. v. Allbritton*, 898 S.W.2d 773, 775 (Tex. 1995), *abrogated on other grounds by Ford Motor Co. v. Ledesma*, 242 S.W.3d 32 (Tex. 2007).

Frez-N-Stor argues that the report of Stephen Legge, one of Rodriguez's experts, offers "no analysis to support [his] claims that Frez-N-Stor's loading operations were the cause in fact of [Rodriguez's] injuries." (Docket Entry No. 81 at 21). Frez-N-Stor argues that Legge's report concludes that Frez-N-Stor did not load the railcar in compliance with American Association of Railroads standards, and that the failure to do so was a "determinant' factor in the incident. (*Id.* (citing Ex. 6 at 10)). Frez-N-Stor contends that Legge's conclusions are insufficient to show that this alleged failure to comply with the standards caused the accident, or how compliance with the standards would have prevented it. (*Id.*).

Frez-N-Stor presents deposition testimony from Michael Dickmeyer, General Director of Freight for Union Pacific and a member of the American Association of Railroads, stating that 100% compliance with either Union Pacific's recommendations or the American Association of

Railroad's standards cannot prevent a load from shifting in transit. (*Id.* at 22). Frez-N-Stor points to this testimony to argue that while Rodriguez may have shown that Frez-N-Stor's alleged negligence in loading the cargo created a condition that made the accident possible, Rodriguez has not shown that Frez-N-Stor's negligence caused the accident. (*Id.*). Frez-N-Stor cites *Bell v. Campbell*, 434 S.W.2d 117 (Tex. 1968), to argue that when a defendant's initial negligent act was not the active cause of the plaintiff's injuries, but merely created the condition allowing a second act of negligence by another party to occur, the resulting harm that results is too attenuated from the defendant's conduct to be the cause-in-fact of the plaintiff's injuries. (Docket Entry No. 81 at 23).

Rodriguez argues that the record evidence supports finding that Frez-N-Stor's failure to safely load the railcar caused his injuries. (Docket Entry No. 96 at 22). Frez-N-Stor does not dispute that Rodriguez's injuries were a foreseeable result of improper loading of the pallets containing heavy loads of frozen chicken products. (*Id.* at 23). Rodriguez points to testimony from fact witnesses, including an Americold supervisor, stating that properly using stretch wrap, dunnage, airbags, and filler is needed to keep cargo stable. (*Id*. at 24-25). Rodriguez argues that even though Frez-N-Stor argues that other defendants—or Rodriguez himself—contributed to cause the accident, that does not entitle Frez-N-Stor to summary judgment because there can be more than one proximate cause of an accident and injury. (*Id.* at 26).

"Proximate cause consists of both cause in fact and foreseeability." *Allbritton*, 898 S.W.2d at 775. Frez-N-Stor does not argue that Rodriguez's injuries were unforeseeable. "To be a cause-in-fact of the accident, a potential tortfeasor's acts or omissions must have been substantial factors in causing the accident." *All Freight Sys. v. James*, 115 F. Appx. 182, 184-85 (5th Cir. 2004). "Specifically, the acts or omissions must be factors without which the accident would not have

occurred." *Id.* at 185.  Although "Texas courts routinely hold that proximate causation is a fact question within the jury's province," *Berry Prop. Mgmt. v. Bliskey*, 850 S.W.2d 644, 656 (Tex. App.—Corpus Christi 1993, writ dism'd by agr.), proximate cause is a question of law "if the circumstances are such that . . . reasonable minds could not arrive at different conclusions." *Mo. Pac. R.R. Co. v. Am. Statesman*, 552 S.W.2d 99, 104-05 (Tex. 1977).

Rodriguez has raised factual disputes material to determining whether Frez-N-Stor's actions were a substantial factor in causing the accident and injuries.  The parties do not dispute that Frez-N-Stor failed to follow the American Association of Railroads standards in securing the load for rail transport, including by failing to use the appropriate amount of stretchwrap, dunnage, airbags, and filler to stabilize the cargo.  Frez-N-Stor's expert, Dickmeyer, testified that the load may have shifted in transit even if Frez-N-Stor had complied with the American Association of Railroads standards in securing the pallets.  Rodriguez's expert, Legge, testified that if Frez-N-Stor had complied with the standards, the pallets would not have shifted during rail transport so much as to become unstable and tip over when unloading began.  The conflicting expert opinions on whether Frez-N-Stor's failure to comply with applicable safe loading standards caused the cargo to shift to the extent that it was unreasonably dangerous to workers unloading it preclude summary judgment on causation.

Frez-N-Stor also argues that Rodriguez's negligence in continuing to unload the railcar by hand after he had apparently realized that doing so was risky was the cause-in-fact of his injuries. Under Texas law, a plaintiff's contributory or comparative negligence bars recovery if he or she is 50 percent responsible.  If the plaintiff is less than 50 percent responsible, that diminishes but does not preclude recovery.  *Perez v. United States*, 830 F.2d 54, 57 (5th Cir. 1987).  It is not clear on this record what amount of fault—if any—Rodriguez should bear, as opposed to the defendants.

There are factual disputes as to when, and to what extent, Rodriguez perceived that unloading the pallets by hand was unreasonably dangerous. Summary judgment on the apportionment of fault is not appropriate on this record.

## IV.    The Motions to Exclude Expert Testimony

Rodriguez has moved to exclude the testimony of two of Frez-N-Stor's experts, Joseph Michels and Christopher Bonanti. (Docket Entry Nos. 103, 105). Frez-N-Stor designated Michels to testify about general safety standards in the shipping industry and specific safety procedures at the Americold facility. Frez-N-Stor designated Bonanti to testify about general loading and unloading operations and to present an analysis of the shifting of the load of chicken parts.

Rodriguez argues that Michels' testimony on Americold's workplace safety procedures is irrelevant and unhelpful to the jury, and that Bonanti relies on unreliable and unverifiable sources to testify that problems during the rail transport—including irregularities in the train's speed— rather than any Frez-N-Stor act or omission, caused the load of pallets to shift and become unstable. Rodriguez requests a hearing on both motions to exclude.

Resolving the motions for summary judgment does not depend on whether the court may properly consider these expert opinions. The court will hear the motions to exclude at the final pretrial conference. At least seven days before that conference, each party intending to submit evidence on the motions to exclude must submit a witness list and an exhibit list and must provide copies of the exhibits to the other side and to the court.

## V.    Conclusion

Americold's motion for summary judgment, (Docket Entry No. 76), is granted.  Frez-N-Stor's motion for summary judgment, (Docket Entry No. 81), is denied.  The motions to exclude expert testimony, (Docket Entry Nos. 103, 105), remain under advisement.

SIGNED on July 22, 2025, at Houston, Texas.

_____
Lee H. Rosenthal
Senior United States District Judge