United States District Court
Southern District of Texas
**ENTERED**
September 08, 2025
Nathan Ochsner, Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| MARCO ANTONIO RODRIGUEZ, *et al.*, | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | CIVIL ACTION NO. H-23-3944 |
| | § | |
| FREZ-N-STOR, INC., *et al.*, | § | |
| | § | |
| Defendant. | § | |

### MEMORANDUM AND OPINION

Marco Antonio Rodriguez and his wife, Rosanna Rodriguez, sued Americold Logistics, LLC and Frez-N-Stor, Inc. seeking damages for injuries he suffered while working at Americold's facility in La Porte, Texas. (Docket Entry No. 45). In March 2023, Rodriguez was instructed to remove pallets of frozen chicken from a railcar. He alleges that when he entered the car, hundreds of pounds of frozen chicken tipped over onto him, severely injuring his spinal cord and resulting in paralysis. He sues Americold for negligence in failing to ensure that the frozen chicken pallets had not shifted during the rail transit before starting to unload them. He also sues Frez-N-Stor, the company responsible for moving the frozen chicken parts from Arkansas to Houston, alleging improper packaging and packing of the frozen chicken pallets.

Frez-N-Stor moves to exclude the plaintiffs' expert, Stephen Legge, who will opine that Frez-N-Stor failed to package the pallets in the railcar consistent with the industry standards of care and that Frez-N-Stor's failure to do so caused Rodriguez's injuries. (Docket Entry No. 118). After careful review of Frez-N-Stor's motion, the plaintiffs' response, and the applicable law, the court denies Frez-N-Stor's motion to exclude Legge's testimony. The reasons are explained below.

## I.    Background

On March 20, 2023, Marco Rodriguez was severely injured while unloading pallets of frozen chicken parts from a railcar at a cold storage warehouse.  (Docket Entry No. 45 ¶¶ 4.1–4.2). Boxes of frozen chicken parts had been loaded onto pallets, which were in turn loaded into a refrigerated railcar.  (*Id*. ¶ 4.2).  Each pallet of frozen chicken weighed hundreds of pounds.  (*Id*.). When the railcar containing the chicken parts arrived in Houston, Rodriguez and the other workers tasked with unloading the railcar had to do so by removing each pallet individually.  (*Id.* ¶ 4.5). After Rodriguez and other workers had safely removed several of the pallets and boxes, Rodriguez re-entered the railcar to unload more boxes of frozen chicken.  (*Id*.).  Hundreds of pounds of frozen chicken then tipped over and collapsed onto Rodriguez, burying him under a pile of wood and meat. (*Id*.).  Rodriguez's spinal cord was severely damaged.  (*Id*.).  He is a quadriplegic.  (*Id*.).

Frez-N-Stor was the company responsible for moving the frozen chicken parts from Arkansas to Houston.  (*Id.* ¶ 4.1).  The plaintiffs allege that Frez-N-Stor was negligent by: (1) failing to properly load and secure the pallets of frozen chicken; (2) failing to use proper air bags and dunnage to secure the pallets of frozen chicken; (3) failing to identify that the pallets of frozen chicken were not reasonably safe for transport via rail; (4) failing to properly package the pallets of frozen chicken; (5) failing to properly package, secure, and brace the pallets of frozen chicken to prevent them from shifting and moving during transit; (6) failing to properly test the packaging, dunnage, and air bag equipment used to secure the pallets of frozen chicken before putting the pallets of frozen chicken in transit; (7) failing to ensure that the railcar was appropriate to transport multiple pallets of frozen chicken; and (8) failing to comply with industry standards and regulations on the recommended and proper procedures for properly and safely loading, securing, and transporting pallets of frozen chicken.  (*Id.* ¶ 5.1).

Legge is the Managing Director at Safety Mitigation Specialist, Inc., a consulting firm that specializes in health-and-safety requirements, including railway load securement. He also serves as a Safety and Security Consultant at Gannett Fleming, an architecture, engineering, and construction firm. (Docket Entry No. 125-2 ¶ 1). He provides consulting and training services on matters relating to railway transportation security and safety, including compliance with safety and security standards set by the Federal Transit Administration, the Federal Railroad Administration, and the Association of American Railroads. (*Id.*). During his career, Legge has accumulated myriad certifications concerning rail-transportation safety, including from programs affiliated with the U.S. Department of Transportation. (*Id.* ¶ 4). He also chaired the subcommittee at the Association of American Railroads that is responsible for promulgating and approving safety standards about the safe loading of goods in railcars. (*Id.* ¶ 5).

Legge has 35 years of experience in the field of railroad transportation safety. (*Id.* ¶ 2). From 1990 to 2022, he worked at the Canadian National Railway, filling many roles related to safety and loading practices. (*Id.* ¶ 3). He trained employees in the Association's safety standards and developed safety management systems for the company to implement. (*Id.*). Legge also investigated accidents and other safety incidents for the Canadian National Railway and the Canadian Pacific Railway; as part of his responsibilities, he "witnessed and investigated railcars that had to be taken out of service because of a load shift on essentially a daily basis." (*Id.*).

Legge plans to offer two core opinions at trial. First, he will opine that the Association promulgates safety guidelines that the industry considers to be the relevant standards of care. (*Id.* at ¶¶ 8–10). He will also testify that the Association's safety standards apply to the loading of the railcar at issue. (*Id.*). Second, he will opine that Frez-N-Stor's failure to properly load the railcar allowed the pallets of chicken parts to shift during transit, causing the pallets to tip over during

3

unloading.  (*Id.* at ¶¶ 12–27).  Legge will explain that Frez-N-Stor failed to properly secure the pallets with stretch wrap and failed to fill void spaces in the railcar with appropriate fillers or blocking materials, such as airbags, in violation of the Association's safety standards.  (*Id.*).

## II.    The Applicable Legal Standard

Federal Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

FED. R. EVID. 702.

Rule 702 "charges trial courts to act as 'gate-keepers,' making a 'preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.'"  *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 243–44 (5th Cir. 2002) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592–93 (1993)).  Expert testimony must be both "relevant and reliable" to be admissible.  *United States v. Tucker*, 345 F.3d 320, 327 (5th Cir. 2003) (quoting *Pipitone*, 288 F.3d at 243–44); *Daubert*, 509 U.S. at 589 (stating that "under the Rules the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable").

Witnesses may be qualified as experts if they possess specialized knowledge, skill, experience, training, or education.  FED. R. EVID. 702.  Experts must have expertise in the general

area in which they testify but need not have expertise in the specialized area directly pertinent to the issues in question. *United States v. Marler*, 614 F.2d 47, 50 (5th Cir. 1980). The court must determine whether the proposed expert's training and experience are sufficiently related to the issues and evidence before the court that the expert's testimony will assist the trier of fact. *Primrose Operating Co. v. Nat'l Am. Ins.*, 382 F.3d 546, 562–63 (5th Cir. 2004).

The court must determine relevance by asking whether the expert testimony will "help the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702; *Daubert*, 509 U.S. at 591; *Pipitone*, 288 F.3d at 245. The court must determine reliability considering the soundness of the general principles or reasoning on which the expert relies and of the methodology that applies those principles to the facts of the case. *Daubert*, 509 U.S. at 594–95; *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 989 (5th Cir. 1997); *Brumley v. Pfizer, Inc.*, 200 F.R.D. 596, 600 (S.D. Tex. 2001). The court's focus is not on the expert's conclusions but on the reasoning and methodology used to reach those conclusions. *Daubert*, 509 U.S. at 594–95. These considerations apply to all types of expert testimony, whether based on "scientific, technical, or other specialized knowledge." FED. R. EVID. 702; *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147–48 (1999); *Tucker*, 345 F.3d at 327.

The reliability factors from *Daubert* include whether the expert's technique or theory can be or has been tested; whether it has been subjected to peer review and publication; whether it has a known or potential rate of error or standards and controls guiding its operation; and whether it has been generally accepted in the scientific community. *Pipitone*, 288 F.3d at 244 (citing *Daubert*, 509 U.S. at 593). "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical

gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

The test for reliability is flexible. The specific factors listed in *Daubert* and its progeny neither necessarily nor exclusively apply to all experts or in every case. *Kumho Tire*, 526 U.S. at 150. The district court "has broad discretion to determine whether a body of evidence relied upon by an expert is sufficient to support that expert's opinion." *Johnson v. Arkema, Inc.*, 685 F.3d 452, 458–59 (5th Cir. 2012) (quoting *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 354 (5th Cir. 2007)). The trial court's role as gatekeeper is not intended to replace the adversary system; "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596; *Pipitone*, 288 F.3d at 250. "[A] trial court must take care not to transform a *Daubert* hearing into a trial on the merits." *Pipitone*, 288 F.3d at 250.

Admissibility of expert testimony is an issue for the trial judge to resolve under Federal Rule of Evidence 104(a). *Daubert*, 509 U.S. at 592–93; *Brumley*, 200 F.R.D. at 601. The party offering the testimony must prove by a preponderance of the evidence that the expert's opinion is relevant and reliable. *Bourjaily v. United States*, 483 U.S. 171, 175–76 (1987); *Mathis v. Exxon Corp.*, 302 F.3d 448, 460 (5th Cir. 2002); *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998); *Brumley*, 200 F.R.D. at 601. "A trial court's ruling regarding admissibility of expert testimony is protected by an ambit of discretion and must be sustained unless manifestly erroneous." *Satcher v. Honda Motor Co.*, 52 F.3d 1311, 1317 (5th Cir. 1995).

## III.    Analysis

Frez-N-Stor's motion to exclude makes seven arguments, but many of them advance overlapping points. The court construes Frez-N-Stor's motion as raising three broad issues with

Legge's testimony: (1) that he is not qualified; (2) that his opinions are neither relevant nor reliable; and (3) that the plaintiffs did not timely serve his supplemental report. None of these issues provides a basis to exclude Legge's testimony.

### A. Qualifications

Frez-N-Stor argues that Legge has no specialized education or training that would qualify him to discuss the physics- or engineering-related aspects of the load shift that he opines were present when the pallets tipped and fell. (Docket Entry No. 118 at 17–18). Frez-N-Stor adds that Legge is not qualified to criticize its expert, Christopher Bonanti, because Bonanti bases his opinions on physics and engineering principles about which Legge has no relevant expertise. (*Id.*). Neither argument is persuasive.

First, Legge does not need specialized education or training in physics or engineering to give his opinions in this case. Under Rule 702, the court may qualify a witness as an expert based on "knowledge, skill, experience, training, *or* education." FED. R. EVID. 702 (emphasis added). The rule's use of the disjunctive allows a witness to establish expertise "in any one of the five ways listed." *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993). The Supreme Court cemented this reading of the rule in *Kumho Tire*. It made clear that that technical and other specialized knowledge "might become the subject of expert testimony," 526 U.S. at 147, and explained that in such situations "reliability concerns may focus upon personal knowledge or experience," not merely academic pedigree or scientific testing, *id.* at 150. Experts may "tie observations to conclusions through the use of general truths derived from specialized experience." *Id.* at 148 (cleaned up).

Courts routinely qualify experts based on their "practical work experience." *See, e.g.*, *Martin v. Wal-Mart Stores, Inc.*, No. 2:10-cv-268, 2011 WL 6399690, at *1 (S.D. Miss. Dec. 20,

2011) (experience gained from working at UPS for "twenty-four years . . . inspecting shrink-wrapped packages to ensure that loads are secure for shipment . . . is sufficient to qualify [an expert] . . . in the realm of packaging, stacking, and moving packages"); *Satcher v. Honda Motor Co.*, 52 F.3d 1311, 1317–18 (5th Cir. 1995) (upholding a court's qualification of an expert who had nine years' experience "investigat[ing] hundreds of motorcycle accidents" but no "formal scientific and engineering training").

These results follow from the primary purpose of expert testimony: to "help the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702.  For example, if the jury needed to know whether bees could fly into the wind, an engineer could likely help the jury understand why bees can do so; he could explain the physics underlying flight and walk the jury from first principles to the ultimate fact.  *See Berry v. City of Detroit*, 25 F.3d 1342, 1349–50 (6th Cir. 1994).  A beekeeper could likely help the jury resolve that factual question, too.  Although the beekeeper may not know any more about the physics of flight than do the jurors, "he has seen a lot more bumblebees than they have" and could rely on those "firsthand observations" to establish that bees can fly into the wind.  *Id.*

The same principles apply here.  Although Legge may or may not have the academic background to testify to the mathematical concepts behind load shifts in railcars, he can certainly testify, based on his many years of experience and his expertise, about the reasons load shifts occur.  He has certainly "seen a lot more [load shifts] than the jurors have." *Id.*  Legge has worked in the railroad industry for 35 years, chaired the subcommittee of the Association of American Railroads that established standards about how to load safely goods onto railcars, trained individuals on how to comply with these standards, and investigated for railroads incidents of improper loading of goods onto railcars.  (Docket Entry No. 125-2 ¶¶ 2–5).  Legge also testified

in his deposition that, every day, he saw railcars taken out of service because of load shifts and that he investigated every one of those incidents that fell within his purview. (Docket Entry No. 125-1 at 85:9–90:12). Beyond this on-the-job experience, numerous agencies and organizations governing railroad safety have accredited or certified Legge. (Docket Entry No. 125-2 ¶ 4). Legge is qualified to testify to the relevant standards of care that apply to safely loading goods on railcars, as well as to the accidents that may occur as a result of failing to adhere to those standards.

Second, Frez-N-Stor's argument that Legge cannot rebut Bonanti's opinions because Bonanti approached the issues from the perspective of physics and engineering is also unpersuasive. Legge may not be able to rebut directly Bonanti's engineering- and physic-based opinions or calculations; he does not appear qualified to do so. But Legge may still rely on his own experience and expertise to highlight errors in how Bonanti approached the issues. For instance, Legge argues that Bonanti's analysis is improper because it focused on lateral voids in the railcar rather than lengthwise voids. In Legge's opinion, lengthwise voids would not have existed in the car had Frez-N-Stor adhered to the Association's standards. (Docket Entry No. 125-1 at 257:18–258:11; *compare* Docket Entry No. 125-5 at 5, *with* Docket Entry No. 125-6 at 10). As another example, Legge and Bonanti dispute whether unanticipated, excessive forces shocked the railcar during transit, causing a load shift. (*See* Docket Entry No. 125-1 at 258:12–260:25). Legge argues that Bonanti improperly assumed the speed at which the train moved during transit, that the train hit a hump in the railroad, and that the train was moving at a fast speed when it hit this hump. (*Id.*). Legge challenges the factual assumptions underlying Bonanti's mathematical calculations by asking the type of questions Legge would ask when investigating railroad incidents as part of his job. *See* FED. R. EVID. 703. Legge appears to be using the same approach to analyzing why this load of pallets fell over that he uses in investigating similar railroad accidents as part of

his job.  In short, Legge is qualified by experience and expertise to criticize Bonanti's analysis of why this load fell over.

### B.    Relevancy and Reliability

Frez-N-Stor next attacks the relevance and reliability of Legge's opinions.  First, Frez-N-Stor argues that Legge's opinions amount to conclusory, ipse dixit statements because they are not based on scientific studies or an accident reconstruction.  (Docket Entry No. 118 at 10–13).  Second, Frez-N-Stor argues that Legge's opinions are unreliable because he failed to consider and rule out alternative causes of the accident.  (*Id.* at 13–18).  Third, Frez-N-Stor argues that Legge's opinions are unreliable because they are based on the Association's recommendations, which are not the industry standard and which do not cover the hazard at issue.  (*Id.* at 18–24).  The court disagrees with each of these arguments.

### 1.    Ipse-Dixit Opinions

Frez-N-Stor argues that Legge's opinions are mere ipse dixits that lack an adequate foundation.  (Docket Entry No. 118 at 10–13).  Legge opined that Frez-N-Stor failed to comply with the Association's guidelines, resulting in 25 to 26 inches of void space in a 64-foot railcar that enabled the pallets to shift and fall on Rodriguez.  (Docket Entry No. 118-2 at 3).  Frez-N-Stor contends that this opinion lacks proper support because Legge did not do an accident reconstruction to analyze the forces applied to the railcar, did not run mathematical calculations, and did not perform fault-tree or root-cause analyses.  (Docket Entry No. 118 at 10–11).

Frez-N-Stor is correct that experts may not rely only on their say-so.  *See Guile v. United States*, 422 F.3d 221, 227 (5th Cir. 2005) ("A claim cannot stand or fall on the mere ipse dixit of a credentialed witness."); *Joiner*, 522 U.S. at 146 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing

10

data only by the ipse dixit of the expert."). But when an expert testifies from experience and training, the expert can explain how the incident in dispute resembles cases he or she has seen before. *See Kumho Tire*, 526 U.S. at 156 ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."); *Van Winkle v. Rogers*, 82 F.4th 370, 379 (5th Cir. 2023) ("Experience alone can provide a sufficient foundation for expert testimony."). Just as the beekeeper "has seen a lot more bumblebees than" the jury, Legge has seen many more railcars and load shifts than the jury. *Berry*, 25 F.3d at 1350. The limiting principle is whether the expert can establish a sufficient foundation for his or her training- and experience-based opinions: "the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." FED. R. EVID. 702 advisory committee's note to 2000 amendment.

The record contains a sufficient foundation for Legge's opinions on how and why the incident occurred. Legge reviewed the extensive record in the case. (*See* Docket Entry No. 125-2 at ¶¶ 13–27 (summarizing the evidence Legge considered)). Legge then connected his experience, the Association's warnings about the need to use proper fillings, airbags, or other dunnage when packing loads in railcars, and the testing that led the Association to adopt standards for the steps needed to safely pack loads in railcars for transit. (*See* Docket Entry No. 121-1 at 55:18–64:7, 243:22–244:12, 252:14–253:23; Docket Entry No. 125-2 ¶ 14 (explaining that Legge's investigation in this case "mirrors" his work in the field)). Legge also performed a load-planning analysis that corroborated his opinions. Legge measured the dimensions of the railcar and calculated the subject load and voids in the car. (Docket Entry No. 125-1 at 121:6–125:18, 128:14–131:9). He used industry-standard software to calculate the void in the railcar and the appropriate placement of airbags, filler, and dunnage to compensate for the voids. (*Id.* at 122:3–

126:6, 128:9–134:21).  Legge's report includes several diagrams displaying his findings.  (*See, e.g.*, Docket Entry No. 125-4 at 417; Docket Entry No. 125-1 at 121:23–126:6).  Based on this analysis and his experience, he concluded that no load shift would have occurred—or that the load shift would have been less severe—if Frez-N-Stor had complied with the Association's standards about the need to use stretch wrap and airbags (or other fillers) to secure loads in a railcar.  (Docket Entry No. 125-2 ¶¶ 13–27).

Frez-N-Stor responds that Legge overstated his opinions, implying certain causation when the Association's standards express only the possibility of a load shift occurring because of excess void space in a railcar.  (*Compare* Docket Entry No. 118-4 at 243:13–18 ("There's no possible way for it to make it to destination with that amount of void inside the railcar and not shift."), *and id.* at 243:19–21 (testifying that "every car with 26 inches of void is going to experience load shift"), *with id.* at 247:9–21, 248:17–24 (recounting that the Association's guidelines state that "uncontrolled movement and a displacement of lading in rail vehicles can cause safety problems, equipment failure, and unloading problems")).

This response is unpersuasive for two reasons.  First, although the Association's standards address only the probability of a load shift occurring if the railcar is not packed consistent with the standards, Legge can rely on his experience to testify that a load shift had occurred in every similar case he investigated.  *See, e.g.*, *Larson v. Matter*, No. 06-cv-1496, 2008 WL 3876015, at *5 (N.D. Tex. Aug. 18, 2008) (permitting a medical expert to testify that "that Larson would probably not have suffered the same injuries had Dr. Matter not been negligent" because the expert's "personal experiences" of treating "numerous patients" with "the same constellation of symptoms" are "sufficiently reliable that no independent studies are required").  Frez-N-Stor may certainly cross-examine Legge about the depth of his experience and expertise and the reliability of the opinions

he reached.  But Legge's experience and expertise are sufficient to allow the jury to decide whether his opinions are accurate or overstated.   Second, even if Frez-N-Stor is correct that Legge is overstating his conclusions, overstatement does not warrant the complete exclusion of Legge's testimony.  *See, e.g.*, *United States v. Glynn*, 578 F. Supp. 2d 567, 569, 574–75 (S.D.N.Y. 2008) (excluding testimony from a ballistics expert that a firearms match existed "to a reasonable degree of ballistic certainty" but allowing testimony that there was "more likely than not" a firearms match).  If Rodriguez does not lay a sufficient foundation at trial for Legge's experience-based opinions, Frez-N-Stor may move to limit them.

The current record presents no basis to exclude Legge's opinions.

## 2.    Alternative Causes

Frez-N-Stor next contends that Legge did not consider: (1) whether the railcar experienced turbulence that would have shifted the pallets of frozen chicken even if Frez-N-Stor loaded them in compliance with the Association's standards; or (2) whether the accident occurred because of Americold's negligence in unloading the pallets.  (Docket Entry No. 118 at 13).  Frez-N-Stor highlights that Legge previously used fault-tree or root-cause analyses to investigate accidents but admits he did not do so here.  (*Id.*).  Because of these omissions, Frez-N-Stor argues that Legge offers an improper *res ipsa loquitur* opinion that cannot establish liability.  *See Michaels v. Avitech, Inc.*, 202 F.3d 746, 753 (5th Cir. 2000).  These arguments do not warrant excluding Legge's testimony at trial.

First, Legge's failure to rule out possible alternative causes does not make his opinions unreliable.  A plaintiff's expert may offer opinions that are relevant only if the plaintiff also proves some underlying fact or assumption through other evidence.  If the plaintiff does not prove the expert's assumptions, then the expert's "opinion is worthless."  *United States v. Cooper*, 277 F.2d

857, 860 (5th Cir. 1960). Legge is "entitled to assume" the "underlying fact[]" that no overly excessive force occurred during the rail transit, or that Americold was not negligent in a way that contributed to cause the accident, and a jury may give Legge's opinions less or no weight if it believes either fact to be false. *Canrig Drilling Tech. Ltd. v. Trinidad Drilling L.P.*, No. 15-cv-0656, 2016 WL 7188657, at *8 (S.D. Tex. Dec. 12, 2016). Frez-N-Stor's alleged alternative causes do not "provide a basis for excluding [Legge's] opinions." *Id.*

Second, there is insufficient evidence in the record establishing Frez-N-Stor's alleged alternative causes to warrant excluding Legge's opinions. "In deciding whether an expert employed a reliable method, the district court has discretion to consider whether the expert has adequately accounted for obvious alternative explanations." *Whatley v. Great Lakes Ins. SE*, No. 19-cv-444, 2020 WL 8970502, at *7 (E.D. Tex. Nov. 30, 2020) (cleaned up); *see* FED. R. EVID 702 advisory committee's note to 2000 amendment ("Whether the expert has adequately accounted for obvious alternative explanations."). "Courts generally find that an alternative cause is 'obvious' when there is strong evidence connecting the potential alternative cause to the claimed injury such that it calls into question the reliability of the opinion." *Tri-Con, Inc. v. Union Pac. R.R. Co.*, No. 20-cv-535, 2023 WL 5098720, at *3 (E.D. Tex. July 31, 2023) (citing *Cooper v. Meritor, Inc.*, No. 16-cv-52, 2019 WL 545187, at *20 (N.D. Miss. Feb. 11, 2019)).

No evidence creates a sufficiently compelling link between some excessive-force event and the falling pallets to warrant excluding Legge's opinions. Bonanti admitted in his deposition that "[t]here's no documentation . . . [of] excessive forces being applied" to the railcar; that "[t]here's no documentation that supports" a finding of "a deceleration of emergency braking"; and that "there's no documentation . . . show[ing] an action by [Union Pacific] caused [the load shift]." (Docket Entry No. 125-7 at 58:19–59:15). Bonati bases his opinions about an excessive-

force event occurring on "inference" and "calculat[ions]," which the jury may or may not find accurate. (*Id.*). The experts dispute whether some excessive force caused the load shift, but given the scant evidence in the record that such a force occurred during the rail transport, this proffered alternative cause is not a basis to exclude Legge's testimony. *See, e.g.*, *Orthoflex, Inc. v. ThermoTek, Inc.*, 986 F. Supp. 2d 776, 803 (N.D. Tex. 2013) (concluding that the possibility of alternative causes was not a basis to exclude an expert when "no evidence in the record . . . establishe[d] that th[o]se intervening events occurred"); *Cooper*, 2019 WL 545187, at *20 (holding that an "alternative explanation" is "not obvious" if the objecting "party offered no . . . evidence in support" of its occurrence (citing *United States ex rel. Dolan v. Long Grove Manor, Inc.*, No. 10-cv-368, 2018 WL 3389733, at *3 (N.D. Ill. July 12, 2018))).

Frez-N-Stor also has not proffered enough evidence of Americold's negligence to warrant excluding Legge's opinions. Legge relies on record evidence to opine that a load shift occurred before anyone at Americold "entered or disturbed the contents of the railcar." (Docket Entry No. 125-4 at 9). He cites photographs taken before the unloading that allegedly show that "boxes had slid off and were leaning." (*Id.*). Legge also cites the testimony of an Americold employee who witnessed firsthand "the movement and the leaning" of the contents inside the railcar. (*Id.*). Rodriguez may introduce this evidence directly, or Legge may rely on it because he would normally do so in the course of his duties investigating safety incidents. *See* FED. R. EVID. 703. Frez-N-Stor may dispute Legge's assessment of Americold's negligence in failing to ensure that the pallets of frozen chicken had not shifted before unloading them. Frez-N-Stor may also dispute the relationship of that failure to Frez-N-Stor's role in causing the accident. But Americold's negligence is not so obvious as to make Legge's opinions unreliable. If the jury concludes that

Americold was negligent, then it may disregard or give little weight to Legge's opinion.[1]  *Cooper*, 277 F.2d at 860; *Canrig Drilling*, 2016 WL 7188657, at *8.  Frez-N-Stor's objection is best raised on cross-examination or in closing argument, not in a motion to exclude.

These reasons make *Michaels*, the main case on which Frez-N-Stor relies, distinguishable. In *Michaels*, the court granted summary judgment on the plaintiff's negligence claim because "expert testimony was necessary to establish the likely cause of an aircraft disaster" and the expert did not rule out "alternative causes" of the disaster.  202 F.3d at 753.  The plaintiff argued that the crash occurred because the aircraft's left vacuum pump failed and debris in the right pump prevented it from sustaining a higher-than-normal load.  *Id.* at 748.  Although the plaintiff argued that negligence caused debris to accumulate in the right vacuum pump, the undisputed facts in the summary judgment record established many other ways in which debris could have accumulated in the pump.  *Id.* at 753.  The plaintiff's expert failure to account for alternative causes that were clearly shown in the evidence doomed the plaintiff's case for causation.  By contrast, in this case, the existence of potential alternative causes is disputed, and there is no clear record evidence that they were present.  The court cannot conclude, on the present record, that Legge's opinions are "worthless."  *Cooper*, 277 F.2d at 860.

Third, Legge's failure to conduct a root-cause or fault-tree analysis is not fatal to the reliability of his opinions.  *Daubert* requires that experts use reliable, rather than optimal or flawless, methodology.  *See Knight*, 482 F.3d at 354–55.  Even if "an alternative (or even better) method to reach" an opinion exists, that "does not mean that the method employed by the instant

---

[1] Frez-N-Stor also does not explain why Americold's negligence is legally relevant to the reliability of Legge's opinions.  Texas law permits more than one proximate cause of an injury.  *See United Rentals N. Am., Inc. v. Evans*, 668 S.W.3d 627, 639–40 (Tex. 2023) ("Texas . . . recognizes that more than one defendant can be held liable for a single injury to a plaintiff.").  Even if Americold was negligent, a jury may still credit Legge's opinions that Frez-N-Store was negligent and that its negligence was a proximate cause of Rodriguez's injury.

expert is unreliable." *Carroll v. Praxair, Inc.*, No. 05-cv-0307, 2007 WL 656646, at *5 (W.D. La. Feb. 23, 2007); *Boltex Mfg. Co., L.P. v. Ulma Piping USA Corp.*, No. 17-cv-01400, 2019 WL 2710234, at *3 (S.D. Tex. June 28, 2019) ("The fact that there may be better or more precise methods does not render an opinion based upon a scientifically accepted methodology inadmissible."). Frez-N-Stor may attempt to undermine Legge's testimony by arguing that he did not use certain analyses, but that does not make his opinions unreliable.

The possibility of alternative causes of the load shift in the railcar is not a sufficient reason to exclude Legge's opinions.

### 3.    The Association of American Railroads Standards

Frez-N-Stor argues that Legge cannot testify that the Association's guidelines are the industry standards. (Docket Entry No. 118 at 18). It contends that the Association's guidelines are not authoritative because interested parties, such as shippers, loaders, and unloaders, approved them; because only two Association members are needed to propose a guideline; and because Legge testified that only around half of the industry complies with the Association's guidelines. (*Id.* at 18–19). Frez-N-Stor also contends that the Association's guidelines do not address unloading practices, so they are not relevant. (*Id.* at 22–23). These arguments are not persuasive.

Legge can reliably opine that the Association's guidelines reflect the industry's standard of care. An expert's experience and qualifications can support his or her identification of industry standards. *See United States v. Moshiri*, 858 F.3d 1077, 1084 (7th Cir. 2017) ("Petrov testified as to the standards within the industry as he had encountered them throughout his considerable personal experience."); *Verdecia v. State Farm Lloyds*, No. 23-cv-67, 2025 WL 1146674, at *3 (W.D. Tex. Apr. 1, 2025) ("Courts across the country allow experts to testify regarding industry customs and practices based on experience."); *Caribbean Utilities Co., Ltd. v. Howard Indus., Inc.*,

17

No. 2:17-cv-00179, 2019 WL 5855990, at *1 (S.D. Miss. Nov. 8, 2019) ("By his knowledge, education, and experience, and expert can testify as to what may or may not be accepted in the industry."); *cf. In re Magnolia Fleet, LLC*, No. 22-cv-504, 2023 WL 2527045, at *3 (E.D. La. Mar. 15, 2023) ("[E]vidence regarding industry custom or practice would require an expert with sufficient knowledge, training and skill to opine on the industry custom or standards.").

Additional evidence in the record supports Legge's testimony. Mike Dickmeyer, Union Pacific's corporate representative, testified that the Association sets the industry's safety guidelines and that they are used as the industry standard. (Docket Entry No. 125-9 at 34:22–35:21 ("Q. And would you consider the AAR guidelines industry standard? A. Yes.")). Union Pacific's Terms and Conditions require customers to comply with the Association's guidelines. (Docket Entry No. 125-10 § E.1.a ("Customer shall load, block, brace, and secure its Shipments in accordance with all applicable Governmental Regulations, UP requirements, and the loading rules of the AAR.")).

Frez-N-Stor responds that Legge's reliance on Union Pacific's Terms and Conditions transforms his expert testimony into impermissible legal arguments about contract interpretation. (Docket Entry No. 118 at 21–23). This argument fails. Legge is not offering inappropriate legal conclusions by identifying references in record evidence to the guidelines that he argues are the industry standard. The Terms and Conditions provide "affirmative evidentiary support" of industry "customs." *M&G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 439 (2015).

Frez-N-Stor also argues that Union Pacific's Terms and Conditions undermine Legge's testimony because the contract refers to the Association's "rules"—which require a high standard for approval and on which Legge does not rely—as opposed to the Association's "guidelines"—which have a looser standard of approval and on which Legge relies. (Docket Entry No. 118 at

21–22).  Because the Association's guidelines are recommendations that industry participants are not required to follow, (*see* Docket Entry No. 118-6 at 79:6–80:19, 85:7–90:8, 92:3–9), Frez-N-Stor contends that Legge cannot rely on them to opine that Frez-N-Stor was at fault for failing to follow them.  (Docket Entry No. 118 at 21–22).

These arguments do not warrant excluding Legge's opinions.  Legge testified in his deposition that the difference between "rules," as used in the Union Pacific contract, or "guidelines" or "industry-setting standards" is irrelevant: the point is that the Association promulgates—whether as "rules" or as "guidelines"—concrete safety recommendations based on field testing.  (Docket Entry No. 125-1 at 187:10–190:1).  Frez-N-Stor's attempt to impugn the credibility of the Association's standards is also separate from the experience on which Legge also relies to reach his conclusions.  Frez-N-Stor's arguments that the Association does not use a rigorous methodology to set the standards on which Legge relies go to the weight of Legge's testimony, not its admissibility.  *See Realtime Data LLC v. EchoStar Corp.*, No. 17-cv-00084, 2018 WL 6266301, at *9 (E.D. Tex. Nov. 15, 2018) ("Defendants' factual disputes relating to [the expert's] underlying data, however, go to the weight of the evidence, not its admissibility.").

Frez-N-Stor argues that the Association's standards are irrelevant because they do not address unloading and because they are focused on avoiding freight damage, not worker safety.  (Docket Entry No. 118 at 22–23).  These arguments are not a basis for excluding Legge's opinions.  First, Legge does not apply the Association's standards to how workers unloaded the railcar.  He focuses on how Frez-N-Stor loaded the railcar, how that caused a load shift in the pallets, and how the load shift caused difficulties in unloading.  Legge cited evidence that the pallets moved before Americold sent workers to unload the railcar.  Legge does not apply the Association's standards beyond their scope.

Second, the Association's standards do address worker safety.  (*See* Docket Entry No. 125-8 at 89 ("Uncontrolled movement and/or displacement of the lading in a rail vehicle can cause safety problems . . . ."); Docket Entry No. 125-1 at 178:1–15 (explaining that the Damage Prevention & Freight Claims Committee promulgates standards to ensure that products are loaded and secured safely)).  And even if the Association's standards primarily concerned avoiding freight damage, they would still be relevant to determining whether Frez-N-Stor caused Rodgriguez's injury; freight may be damaged when it falls to the ground or on people.

Legge may testify that the Association's guidelines set the industry's standard of care, and he may rely on them as a basis for his opinions.

## C.    Failure To Timely Supplement

Frez-N-Stor finally argues that Legge untimely disclosed his supplemental report because he released it six months past the expert designation deadline.  (Docket Entry No. 118 at 23).  Legge issued his initial report on November 15, 2024, (Docket Entry No. 118-2), and completed his supplemental report on March 27, 2025, (Docket Entry No. 118-5).  It appears that the plaintiffs did not produce Legge's supplemental report until June 10, 2025.  (*Id.*).  This timeline suggests the plaintiffs failed to serve Legge's supplemental report until the day of his deposition despite having it prepared well before then.  This litigation misconduct could support excluding the opinions in that report.  In this case, however, the plaintiffs' belated disclosure is not so untimely as to warrant excluding the opinions in that supplemental report.

Rule 26(e)(2) governs supplemental disclosures of expert reports.  It specifies that "any additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due."  FED. R. CIV. P. 26(e)(2).  The expert must make any supplemental discloses "at least 30 days before trial[]" "[u]nless the court orders otherwise[.]"

Fed. R. Civ. P. 26(a)(3)(B).  Under Rule 26, Rodriguez timely supplemented Legge's opinions.  In addition, the court's scheduling order set the relevant pretrial-disclosure deadline as September 23, 2025.  (Docket Entry No. 38 ¶ 7 (explaining the "Joint Pretrial Order will contain the pretrial disclosures required by Rule 26(a)(3)")).  The deadline for filing the Joint Pretrial Order was initially July 25, 2025, (*see id.*), but the court extended it to September 23, 2025, on Frez-N-Stor's motion for continuance, (Docket Entry No. 119).  Under all relevant deadlines, Legge timely supplemented his disclosures.

Finally, Frez-N-Stor does not show prejudice.  If Frez-N-Stor felt it could not properly cross-examine Legge on the opinions in his supplemental report during his deposition, it could have sought to continue Legge's deposition to another date or raise with the court the need for an additional deposition on that supplemental report.  Frez-N-Stor did not request either.  Nor has Frez-N-Stor pointed to specific opinions in the supplemental report that it did not have a proper opportunity to conduct discovery on or to prepare its own expert to rebut.  On this record, the court denies the request to preclude Legge from testifying to the opinions in that supplemental report.

## IV.    Conclusion

The court denies Frez-N-Stor's motion to exclude Legge's opinions and testimony. (Docket Entry No. 118).

SIGNED on September 5, 2025, at Houston, Texas.

_Lee H. Rosenthal_

_____
Lee H. Rosenthal
Senior United States District Judge

21